IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:15-CV-23-D

LINC OSHEA BROOKS, and )
APRIL GLADNEY BROOKS, )
 )
          Plaintiffs, )
 )
v. ) **ORDER**
 )
J.D. DOUGHTIE, et al., )
 )
          Defendants. )

On May 1, 2015, Linc Oshea Brooks ("Linc") and April Gladney Brooks ("April") filed a complaint against Dare County Sheriff J.D. Doughtie and Dare County Deputy Sheriff Kevin Duprey in their individual and official capacities, the Ohio Casualty Insurance Company ("OCIC") and Liberty Mutual Group, Inc., as sureties, and John Doe 1 Surety Company and John Doe 2 Surety Company [D.E. 1]. The complaint alleged a state-law claim for intentional infliction of emotional distress, a statutory-bond claim, and federal claims under 42 U.S.C. § 1983. See id. ¶¶ 102–176. On September 14, 2015, the parties filed a joint stipulation of dismissal of all sureties other than OCIC [D.E. 26]. On October 31, 2016, defendants moved for summary judgment [D.E. 36]. Plaintiffs responded in opposition [D.E. 47–49], and defendants replied [D.E. 50]. As explained below, the court grants defendants' motion for summary judgment.

I.

Plaintiffs' complaint arises out of a traffic stop and detention that occurred in February 2014. On February 13, 2014, "[p]laintiffs were traveling eastbound on Virginia Dare Hwy, driving a silver 2008 Mercedes Benz CLS 550, when the[y] experienced a tire malfunction on the rear driver side."

Compl. [D.E. 1] ¶ 13; see L. Brooks Dep. 25–26 [D.E. 39-8] 9–10. Linc was driving, and slowed down to 25 miles per hour and activated the flashers. See Compl. ¶¶ 13–14. SBI Special Agent R. Jason Godfrey passed plaintiffs' car while driving on the same road, "and because traffic usually runs at about 70 mph or more, . . . was concerned about the safety of this situation." Godfrey Aff. [D.E. 39-5] ¶ 4. Godfrey "slowed down to allow the vehicle to pass . . . so that [he] could read the license plate," and "checked the license plate number in an official law enforcement database." Id.; cf. L. Brooks Dep. 34–37 [D.E. 39-8] 12. Godfrey learned that the car was registered to a man much younger than Linc (and later learned that the car's registered owner was Linc's son). Godfrey Aff. ¶ 4. Godfrey then "traveled past the vehicle and turned into a rest stop at the end of the bridge near Manteo to further observe the vehicle and the occupants once the vehicle was off the bridge." Id.; cf. Compl. ¶¶ 16–17 (alleging that Godfrey pulled ahead of plaintiffs' car and "veered off the road onto what appeared to be a wooded area," only to again pull up to and around plaintiffs' car and turn left at an intersection). Although plaintiffs' car had a flat tire, plaintiffs drove past a rest stop and a gas station. Godfrey Aff. ¶ 5.

Godfrey "then called Deputy Shaun Barrera, who [Godfrey] knew was on duty as a patrol officer for the Dare County Sheriff's Office, and informed him that a motorist with a flat tire in a silver Mercedes might need help between the bridge and Nags Head." Godfrey Aff. ¶ 4; see Barrera Aff. [D.E. 39-4] ¶ 4. Barrera "pulled up behind Plaintiff and initiated a traffic stop on Plaintiff, illuminating blue lights. Plaintiff responded to the lights by pulling into a parking lot and stopping his car." Compl. ¶¶ 18–19; see Barrera Aff. ¶ 4; L. Brooks Dep. 41 [D.E. 39-8] 13; A. Brooks Dep. 25–26 [D.E. 39-9] 8–9. Barrera identified himself to Linc. Linc responded that he was "a retired Rocky Mount Police Officer trying to make it to a store where his wife could use a restroom, and informed Barrera that he had a firearm in his vehicle." Compl. ¶¶ 20–21; see Barrera Aff. ¶ 4; L.

2

Brooks Dep. 42 [D.E. 39-8] 14. Barrera quickly ended the traffic stop, but when Linc got back on the road, "his tire collapsed, forcing him to pull into the parking lot of [a restaurant], just down the street from a store." Compl. ¶ 24; see Barrera Aff. ¶ 4 ("The entire stop lasted less than three minutes."); A. Brooks Dep. 28 [D.E. 39-9] 9.[1]

Barrera called Godfrey back "and let him know that everything was fine and that the man was a retired police officer and did not need help." Barrera Aff. ¶ 4; see Godfrey Aff. ¶ 6. Godfrey, however, "became more curious" and called another SBI agent, Albert Ray Summerlin to "ask[] Agent Summerlin if he knew of someone who was a retired Rocky Mount Police officer and matched the physical description of the driver." Godfrey Aff. ¶ 6; see Summerlin Aff. [D.E. 39-6] ¶ 6. In 2013, Summerlin had interviewed a prisoner who "positively identified Mr. Brooks by photograph[]" and "said that Mr. Brooks was a former police officer in Rocky Mount, drove a silver Mercedes, and was involved in the drug trade and the racing business." Summerlin Aff. ¶ 5 & Ex. A [D.E. 39-6] 11–12 (DEA interview report). Summerlin also was aware of another 2013 interview with a federal prisoner in which "the prisoner said that Linc Books [sic] had sold him 16 to 18 kilos of cocaine since 2006." Summerlin Aff. ¶ 7. Summerlin called the Rocky Mount Police Department and spoke with a captain "who told [Summerlin] that Brooks had retired from the department on medical disability and that police there believed he was involved in drug trafficking." Id. ¶ 6. Summerlin "reported this information immediately to Special Agent Godfrey." Id.; see Godfrey Aff. ¶ 6; cf. Duprey Aff., Ex. A [D.E. 39-1] 7 (incident report indicating that Duprey spoke to Summerlin, who "advised [Duprey] that there were debriefs on Linc Brooks that tied him into dealing large

---

[1] Plaintiffs' complaint alleges that they pulled into the parking lot of Basnight's Restaurant. Compl. ¶ 24. However, plaintiffs apparently pulled into the parking lot of Stone Oven Pizza. See Duprey Aff. ¶ 4; Henderson Aff. [D.E. 39-2] ¶ 4; Barrera Aff. ¶ 5; L. Brooks Dep. 40, 45, 90 [D.E. 39-8] 13–14, 26.

3

amounts of cocaine"); Pls.' Ex. 1 [D.E. 49-1] 3 (same). Godfrey "immediately called Captain Kevin Duprey, the chief narcotics investigator for the Dare County Sheriff's Office, and told him all this information." Godfrey Aff. ¶ 6; see Duprey Aff. [D.E. 39-1] ¶ 4 & Ex. A [D.E. 39-1] 7; Pls.' Ex. 1 [D.E. 49-1] 3.

Meanwhile, Linc walked with April to the nearby store and then returned to their car. Compl. ¶ 25; see A. Brooks Dep. 38 [D.E. 39-9] 12. While sitting in their car with the engine running, a Nags Head police officer pulled into the parking lot behind them, activated his blue lights, demanded to see Linc's license and registration, placed a phone call, then returned Linc's license and registration to him and left. See Compl. ¶¶ 27–33; L. Brooks Dep. 47–49 [D.E. 39-8] 15; A. Brooks Dep. 38–40 [D.E. 39-9] 12; Pls.' Ex. 6 [D.E. 49-6] (event report).

Captain Duprey was on patrol searching for plaintiffs, located them in the restaurant parking lot, and began to observe them. Compare Compl. ¶ 26; L. Brooks Dep. 50 [D.E. 39-8] 16 with Henderson Aff. ¶ 5 ("Duprey had been observing Mr. and Mrs. Brooks in the parking lot for several minutes when we pulled up."); Duprey Aff., Ex. A [D.E. 39-1] 7; Pls.' Ex. 1 [D.E. 49-1] 3. At some point, an individual named Marshall Gallop arrived to assist plaintiffs with their flat tire in response to a phone call Linc had placed to Gallop's brother Mike. Compare Compl. ¶ 36; L. Brooks Dep. 26–29, 52–55 [D.E. 39-8] 10, 16–17; A. Brooks Dep. 40–41 [D.E. 39-9] 12; Gallop Aff. [D.E. 49-10] 2, with Duprey Aff., Ex. A [D.E. 39-1] 7; Pls.' Ex. 1 [D.E. 49-1] 3; Henderson Aff. ¶ 5. Marshall Gallop was familiar to several officers on the scene, including Captain Duprey, based on his criminal record for drug trafficking, and Mike Gallop "was fired from a law enforcement agency amid rumors that he too was involved in the illegal drug trade." Duprey Aff. ¶ 4 & Ex. A [D.E. 39-1] 7; Pls.' Ex. 1 [D.E. 49-1] 3; see Henderson Aff. ¶ 7.

Captain Duprey contacted Barrera and asked him to come to the restaurant parking lot with

4

Barrera's K9 police dog. Barrera Aff. ¶ 5; see Duprey Aff., Ex. A [D.E. 39-1] 7, 17; Pls.' Ex. 1 [D.E. 49-1] 3; Godfrey Aff. ¶ 7. Several officers arrived on the scene, including Henderson, Barrera, and Godfrey. See Compl. ¶¶ 40–41; Henderson Aff. ¶¶ 4–5; Godfrey Aff. ¶ 7; Duprey Aff., Ex. A [D.E. 39-1] 11. Although a tow truck had arrived to tow plaintiffs' vehicle, Captain Duprey informed plaintiffs that he intended to run a K9 dog around plaintiffs' vehicle. See Compl. ¶¶ 38–39, 42–45; Duprey Aff., Ex. A [D.E. 39-1] 7, 11; Pls.' Ex. 1 [D.E. 49-1] 3, L. Brooks Dep. 55–56 [D.E. 39-8] 17; A. Brooks Dep. 63–64 [D.E. 39-9] 18. Plaintiffs did not consent. See Compl. ¶ 54; Duprey Aff., Ex. A [D.E. 39-1] 7; Henderson Aff. ¶ 7; L. Brooks Dep. 56 [D.E. 39-8] 17; Gallop Aff. [D.E. 49-10] 2. Defendants assert that the K9 alerted to the presence of a controlled substance odor, which plaintiffs dispute. Compare Compl. ¶¶ 46, 49, 51–52; L. Brooks Dep. 56–57, 63–66 [D.E. 39-8] 17, 19–20; Gallop Aff. [D.E. 49-10] 2, with Duprey Aff., Ex. A [D.E. 39-1] 7, 17; Henderson Aff. ¶ 6; Barrera Aff. ¶¶ 6–7.[2]

At plaintiffs' request, Captain Duprey summoned Sheriff Doughtie to the scene. See Compl. ¶¶ 56–59; Doughtie Aff. [D.E. 39-3] ¶ 3; L. Brooks Dep. 58–59 [D.E. 39-8] 18; A. Brooks Dep. 64–65 [D.E. 39-9] 18. Doughtie told Linc that one of the officers had spoken with someone who "did not have anything good to say about" Linc, but Doughtie asserts that the conversation remained "courteous." Compare Compl. ¶ 60; L. Brooks Dep. 59–60 [D.E. 39-8] 18, with Doughtie Aff. ¶ 3. Either Sheriff Doughtie or Captain Duprey informed plaintiffs "that they were not being arrested or detained but that we were taking their car back to the sheriff's office [to search it further] and they were free to return with us or leave as they saw fit." Doughtie Aff. ¶ 4; see Compl. ¶ 63; Duprey

---

[2] The K9 also alerted on Marshall Gallop's car. See Duprey Aff., Ex. A [D.E. 39-1] 7; Barrera Aff. ¶ 5; cf. L. Brooks Dep. 62 [D.E. 39-8] 19; Gallop Aff. 2. "That vehicle was searched and nothing located. They were allowed to leave." Duprey Aff., Ex. A [D.E. 39-1] 7; see L. Brooks Dep. 62 [D.E. 39-8] 19; cf. Gallop Aff. 2.

Aff., Ex. A [D.E. 39-1] 8; Henderson Aff. ¶ 8; L. Brooks Dep. 60–61 [D.E. 39-8] 18. "Plaintiff verbally opposed the planned action, asking Sheriff Doughtie what right they had to take Plaintiffs' car and move it to the Sheriff's Office without a search warrant, but the Sheriff maintained that they were going to do a more thorough search of the car in a lighted area before they release it." Compl. ¶ 64; see L. Brooks Dep. 60–61 [D.E. 39-8] 18.

Plaintiffs and the officers went to the sheriff's office. See Compl. ¶¶ 65–68; Duprey Aff., Ex. A [D.E. 39-1] 8; Henderson Aff. ¶ 8; Doughtie Aff. ¶ 4. The parties dispute whether plaintiffs were in custody at this point, although plaintiffs admit that they had not been formally arrested. Compare Compl. ¶¶ 66–67; L. Brooks Dep. 66–67 [D.E. 39-8] 20, with Henderson Aff. ¶ 8; Doughtie Aff. ¶ 4. Plaintiffs contend that they were instructed to accompany the officers to the station. See L. Brooks Dep. 66–67 [D.E. 39-8] 20. Although no one formally questioned plaintiffs, Sheriff Doughtie "was trying to interview [Linc] . . . in his slick way" by "starting to ask . . . questions about what [plaintiffs] planned to do when [they] were down there, did [plaintiffs] know anybody down there, things of that nature." L. Brooks Dep. 69–70 [D.E. 39-8] 20–21.

At the sheriff's office, Barrera ran the K9 around the car again, and the K9 again alerted to the presence of a controlled substance odor on both the passenger and driver's sides of the vehicle, and on the floorboards of the front seats. See Duprey Aff., Ex. A [D.E. 39-1] 8, 13, 17; Henderson Aff. ¶ 8; cf. Compl. ¶¶ 68–69 (alleging that the K9 "f[ound] nothing"). For approximately two hours, Duprey "and other officers used micro cameras to search in hard to reach areas of the car, raised and searched under the hood on the car and in the trunk, and used wrenches to take the car apart." Compl. ¶¶ 69–70; see Duprey Aff., Ex. A [D.E. 39-1] 8, 13–14; Henderson Aff. ¶¶ 9–10. Plaintiffs allege that "[a]fter more than two hours of watching the destruction of his car with nothing being found to justify it, [Linc] pleaded with Sheriff Doughtie to stop, saying that this has gone on

6

for too long" and "requested that the Sheriff end this situation and have his car put back together." Compl. ¶¶ 70–71; see L. Brooks Dep. 74–75 [D.E. 39-8] 22. "Sheriff Doughtie said that he agreed, but that, '. . . the way this car is torn to pieces there's no way we can get it put back together tonight'." Compl. ¶ 72 (alteration in original).

During the course of the search, Henderson "found six air fresheners in a compartment under the driver's side seat and another one under the rear seat," which "drug dealers often use . . . in an attempt to mask the odor of illegal drugs and throw off the scent of police drug dogs." Henderson Aff. ¶ 9; see Duprey Aff. ¶ 4 & Ex. A [D.E. 39-1] 14; cf. L. Brooks Dep. 143–45 [D.E. 39-8] 39; A. Brooks Dep. 90–91 [D.E. 39-9] 25. Henderson also found "tiny white powder specks" that tested positive for cocaine when tested with "a Nark Swipe, a moist towelette that is pink but turns bright blue when it comes into contact with cocaine." Henderson Aff. ¶ 10; see Duprey Aff. ¶ 4 & Ex. A [D.E. 39-1] 8, 18; Doughtie Aff. ¶ 4; cf. Compl. ¶¶ 74–77; L. Brooks Dep. 74–79 [D.E. 39-8] 22–23 (disputing the validity of the swipe); A. Brooks Dep. 91–93 [D.E. 39-9] 25.

"At that time the search was stopped and it was determined that the search would continue the following morning after obtaining a Search Warrant." Duprey Aff., Ex. A [D.E. 39-1] 8; see Compl. ¶ 77; Henderson Aff. ¶ 10. "Lt. Duprey released Plaintiffs with their luggage (which was never searched), and . . . . told Plaintiffs that they could meet him at the Sheriff's Office in the morning around 9:00 a.m. to watch them conduct a more complete search of Plaintiffs' car for hidden compartments, after they obtain a search warrant." Compl. ¶¶ 80–81; see Duprey Aff., Ex. A [D.E. 39-1] 8–9, 14; Pls.' Ex. 1 [D.E. 49-1] 4–5; Pls.' Ex. 3 [D.E. 49-3]; L. Brooks Dep. 76 [D.E. 39-8] 22.

The following morning, Duprey applied for and obtained a search warrant. See Duprey Aff., Ex. A [D.E. 39-1] 20–25 (search warrant and application); Pls.' Ex. 2 [D.E. 49-2] (search warrant

7

application); cf. Compl. ¶ 86; L. Brooks Dep. 99 [D.E. 39-8] 28. The sheriff's office had plaintiffs' vehicle towed to a municipal garage in Kill Devil Hills to conduct the search. See Duprey Aff., Ex. A [D.E. 39-1] 9, 14; Pls.' Ex. 1 [D.E. 49-1] 5; Pls.' Ex. 3 [D.E. 49-3] 6; Henderson Aff. ¶ 11; cf. Compl. ¶¶ 82–83; L. Brooks Dep. 97 [D.E. 39-8] 27. "Lt. Duprey ... brought in an interdiction team from Raleigh NC to conduct the search along with D.E.A. Agent Bubba Summerlin." Compl. ¶ 88; see Duprey Aff., Ex. A [D.E. 39-1] 9, 14; Summerlin Aff. ¶ 8. Summerlin encouraged Linc to cooperate with law enforcement. See Compl. ¶ 90; Summerlin Aff. ¶ 8; L. Brooks Dep. 102–04 [D.E. 39-8] 29. The officers did not find any narcotics in the vehicle, and they changed plaintiffs' flat tire before returning the vehicle to Linc. See Compl. ¶ 96; Duprey Aff., Ex. A [D.E. 39-1] 9, 15; Henderson Aff. ¶ 11.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence

and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A.

Count four seeks relief against all defendants for unlawful search and seizure in violation of the Fourth, Fifth, and Fourteenth Amendments. Compl. ¶¶ 140–47. Count six challenges defendants' warrantless seizure and "repeated warrantless searches" of plaintiffs' vehicle. Id. ¶¶ 160–67.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose," constitutes a Fourth Amendment seizure. Whren v. United States, 517 U.S. 806, 809–10 (1996); see Brendlin v. California, 551 U.S. 249, 254–56 (2007). The court evaluates plaintiffs' detention under Terry v. Ohio, 392 U.S. 1, 19–20 (1968). Under Terry, defendants' actions must be "justified at [the] inception," and their subsequent questioning and search "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; United States v. Green, 740 F.3d 275, 279 (4th Cir. 2014).

An automobile stop is a reasonable seizure if "the police have probable cause to believe that a traffic violation has occurred." Whren, 517 U.S. at 810. Probable cause that a traffic violation has occurred "exists if, given the totality of the circumstances, the officer had reasonably trustworthy information sufficient to warrant a prudent person in believing that the [seized person] had committed or was committing an offense." United States v. Sowards, 690 F.3d 583, 588 (4th Cir. 2012) (alterations and quotation omitted); see United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). "Because a traffic stop is more analogous to an investigative detention than a custodial arrest," a court analyzes the validity of a traffic stop by asking if the stop "was justified at its

9

inception" and if "the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) (quotation omitted); see Illinois v. Caballes, 543 U.S. 405, 407–09 (2005).

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). During a traffic stop, an officer may order the driver to get out of the car. See, e.g., Pennsylvania v. Mimms, 434 U.S. 106, 108–11 (1977) (per curiam). An officer may extend a traffic stop if the officer has "reasonable suspicion of a serious crime." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc) (quotation omitted). An officer has reasonable suspicion of a crime if the officer can point to specific articulable facts that suggest criminal activity. The officer need not have probable cause. See Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000). "[W]hen an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011); see United States v. Hensley, 469 U.S. 221, 223, 232 (1985); Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971); United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996); United States v. Laughman, 618 F.2d 1067, 1072–73 (4th Cir. 1980).

Defendants' actions were justified at the inception. See N.C. Gen. Stat. § 20-122.1(a) (requiring vehicles to have safe tires); United States v. Palmer, 820 F.3d 640, 651–53 & n.7 (4th Cir. 2016); United States v. Branch, 537 F.3d 328, 335–40 (4th Cir. 2008); United States v. Lopez-Moreno, 420 F.3d 420, 431–32 (5th Cir. 2005). Defendants did not improperly expand the scope of the stop or unreasonably prolong the stop in order to conduct a canine sniff. See Caballes,

543 U.S. at 410; Palmer, 820 F.3d at 651; Buchanan v. Kelly, 592 F. App'x 503, 506 (7th Cir. 2014) (per curiam) (unpublished); Digiovanni, 650 F.3d at 511–13; Neal v. Melton, 453 F. App'x 572, 579–81 (6th Cir. 2011) (unpublished). The canine alert gave defendants probable cause to seize the vehicle and conduct a warrantless search. See Florida v. Royer, 460 U.S. 491, 506 (1983); Palmer, 820 F.3d at 650–53; United States v. Kelly, 592 F.3d 586, 592 (4th Cir. 2010); cf. United States v. Jacobsen, 466 U.S. 109, 123 (1984); United States v. Place, 462 U.S. 696, 708–10 (1983). Moreover, plaintiffs' challenge to the validity of the canine alerts does not alter the court's analysis that defendants had probable cause to tow the vehicle to the sheriff's office and conduct a warrantless search of the vehicle. See Chambers v. Maroney, 399 U.S. 42, 52 (1970); United States v. Ludwig, 641 F.3d 1243, 1251–53 (10th Cir. 2011); United States v. Kerns, No. 2:15-cr-00217, 2016 WL 5745117, at *8 (S.D. W. Va. Sept. 30, 2016) (unpublished).

In opposition to this conclusion, plaintiffs contend that various discrepancies in the police reports are "dominos of lies" precluding summary judgment. See Pls.' Mem. Opp'n Defts.' Mot. Summ. J. [D.E. 47] 15–21. Plaintiffs' contentions concerning defendants' subjective motivations and false statements do not alter the court's analysis. See Devenpeck v. Alford, 543 U.S. 146, 153–56 (2004); Whren, 517 U.S. at 812–14; see also Massey v. Ojaniit, 759 F.3d 343, 354–56 (4th Cir. 2014). Thus, the court grants summary judgment to defendants on plaintiffs' claims in count four and six.

B.

Count two alleges that defendants Doughtie and Duprey, "acting individually and in concert, without probable cause initiated and continued a criminal investigation and an unconstitutional search and seizure against the Plaintiffs" in violation of the Fourth Amendment. See Compl. ¶¶

119–128. Count five alleges a claim for unlawful detention and arrest against all defendants. Id. ¶¶ 148–159.

"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Kaupp v. Texas, 538 U.S. 626, 629 (2003) (quotation omitted); see Florida v. Bostick, 501 U.S. 429, 436–37 (1991); California v. Hodari D., 499 U.S. 621, 625–26 (1991). Circumstances indicating that a person "was not free to leave" include the "threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554 (1980); see Terry, 392 U.S. at 19 n.16; Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 461 (4th Cir. 2013). In analyzing plaintiffs' claim, the court "first must decide if and when [plaintiffs were] 'seized' for purposes of the Fourth Amendment," and "then determine whether the law enforcement officer had adequate justification to support the seizure." Santos, 725 F.3d at 460 (citations omitted).

Defendants seized plaintiffs when they instructed plaintiffs to accompany them to the sheriff's office. See Hayes v. Florida, 470 U.S. 811, 815–16 (1985); Santos, 725 F.3d at 462; Hoover v. Walsh, 682 F.3d 481, 498–99 (6th Cir. 2012). The seizure was justified, however, because defendants had probable cause to believe that plaintiffs' vehicle contained narcotics, and thus had probable cause to arrest plaintiffs. See, e.g., Devenpeck, 543 U.S. at 152; Illinois v. McArthur, 531 U.S. 326, 328–32 (2001); New v. Denver, 787 F.3d 895, 900 (8th Cir. 2015); Robinson v. Cook, 706 F.3d 25, 36–37 (1st Cir. 2013); Hoover, 682 F.3d at 499; Resendiz v. Miller,

12

203 F.3d 902, 904 (5th Cir. 2000) (per curiam); Gass v. Murphy, No. 3:11-1584, 2013 WL 5488712, at *7 (M.D. Pa. Sept. 30, 2013) (unpublished). Accordingly, the court grants summary judgment to defendants on counts two and five.

C.

Count one alleges that Sheriff Doughtie "as the executive officer with final policy-making authority and supervisor and the Sheriff's agents and deputies, acting under color of law, violated the First, Fourth, and Fourteenth Amendment rights of Plaintiffs (citizens) to Privacy, Liberty, rights against unreasonable Search and Seizure, against discrimination based on Race, Due Process rights, and other valuable rights." Compl. ¶ 104. Count three alleges "supervisory violations of 42 U.S.C. § 1983" against defendants Duprey and Doughtie. Compl. ¶¶ 129–139.

To avoid summary judgment, plaintiffs must show a genuine issue of material fact concerning whether: (1) a constitutional injury occurred as a result of an employee's conduct; (2) Sheriff Doughtie had a policy or custom that amounted to a deliberate indifference to the deprivation of plaintiffs' constitutional rights; and (3) this policy or custom caused the alleged constitutional injury. See, e.g., City of Canton v. Harris, 489 U.S. 378, 388–92 (1989); Smith v. Atkins, 777 F. Supp. 2d 955, 966–67 (E.D.N.C. 2011). "[T]he inadequacy of police training may serve as a basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Harris, 489 U.S. at 388; see Connick v. Thompson, 563 U.S. 51, 60–62 (2011); Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 408–10 (1997); Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000); Carter v. Morris, 164 F.3d 215, 220–21 (4th Cir. 1999). Thus, to establish a claim under section 1983 for failure to train law enforcement officers, a plaintiff must show that "officers are not adequately trained 'in relation to the tasks that the particular officers must perform' and this deficiency is 'closely related to the

13

ultimate injury.'" Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003) (quoting Harris, 489 U.S. at 390–91). Moreover, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train . . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Thompson, 563 U.S. at 62 (quotation omitted); see Doe, 225 F.3d at 456; Smith, 777 F. Supp. 2d at 967. Only in the rarest of circumstances may "the unconstitutional consequences of failing to train . . . be so patently obvious that a city could be liable under [section] 1983 without proof of a pre-existing pattern of violations." Thompson, 563 U.S. at 64; see, e.g., Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality opinion).

"Here, plaintiffs have not identified any specific training deficiencies, and there is no pattern of unconstitutional conduct." Smith, 777 F. Supp. 2d at 967; see Schaffer v. Beringer, 842 F.3d 585, 596–97 (8th Cir. 2016), cert. denied, No. 16-1262, 2017 WL 1426359 (U.S. June 26, 2017). To the extent plaintiffs proceed against Lieutenant Duprey on a theory that he "directed other deputies to join in committing unconstitutional violations of Plaintiffs' rights, knowing that Plaintiffs' constitutional rights were being violated," Compl. ¶ 133, the claim fails because no defendant violated plaintiffs' constitutional rights. See, e.g., Robinson, 706 F.3d at 37–38. Thus, the court grants summary judgment to defendants on counts one and three.

### D.

Alternatively, defendants assert that they are entitled to qualified immunity. Mem. Supp. Defs.' Mot. Summ. J. [D.E. 37] 17–21. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

14

rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam); City & Cty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1774 (2015); Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam); Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Taylor, 135 S. Ct. at 2044; Sheehan, 135 S. Ct. at 1774; Carroll, 135 S. Ct. at 350.

The court asks two questions to determine whether qualified immunity applies: first, "whether the facts that a plaintiff has ... shown ... make out a violation of a constitutional right," and second, "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quotation omitted); see Reichle, 132 S. Ct. at 2093; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts may decide which question to address first. Pearson, 555 U.S. at 236. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id.; see Reichle, 132 S. Ct. at 2093. A defendant is entitled to dismissal on qualified-immunity grounds if the answer to either question is "no." See, e.g., Reichle, 132 S. Ct. at 2093; al-Kidd, 563 U.S. at 735; Miller v. Prince George's Cty., Md., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 606 (E.D.N.C. 2009).

15

Plaintiffs have failed to demonstrate a constitutional violation. See, e.g., Schaffer, 842 F.3d at 592; New, 787 F.3d at 901; Hoover, 682 F.3d at 500; Resendiz, 203 F.3d at 904; Gass, 2013 WL 5488712, at *8. Thus, defendants are entitled to qualified immunity.

E.

Count seven alleges a state-law claim of intentional infliction of emotional distress. Compl. ¶¶ 168–176. To survive summary judgment on this claim, plaintiffs must show that: (1) the defendant engaged in extreme and outrageous conduct; (2) the conduct was intended to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. See Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992). To be considered "extreme and outrageous," the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986) (quotation omitted). Whether conduct qualifies as "extreme and outrageous" is a question of law for the court. See, e.g., Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Plaintiffs have failed to raise a genuine issue of material fact concerning whether any defendant engaged in extreme and outrageous conduct. As a matter of law, they did not. See, e.g., Robinson, 706 F.3d at 38; Hensley v. Suttles, 167 F. Supp. 3d 753, 768–69 (W.D.N.C. 2016); Benson v. Vance Cty. Sheriff, No. 5:05-CV-506-BR(3), 2006 WL 4821431, at *4–5 (E.D.N.C. Dec. 12, 2006) (unpublished). Thus, the court grants summary judgment to defendants on count seven.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 36]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 31 day of August 2017.

*J. Dever*
JAMES C. DEVER III
Chief United States District Judge